KELLY v. RED OWL STORES, INC.

1. NEGLIGENCE—PATRON IN SELF-SERVE GROCERY—CONTRIBUTORY NEG-
LIGENCE.
    Plaintiff patron in self-serve grocery store *held*, not shown to
    have been guilty of contributory negligence in falling to
    floor on unbarricaded damp spot where glass jar of olives
    had recently fallen and broken.

2. SAME—STOREKEEPERS—PATRONS.
    A storekeeper is not an insurer of the safety of patrons within
    his store.

3. SAME—STOREKEEPERS—FLOORS—EVIDENCE.
    Evidence supported jury's verdict for plaintiff in her action
    against storekeeper for back injuries sustained as result
    of defendant's negligence when she fell on unbarricaded
    damp spot on floor in self-serve grocery where a glass jar
    of olives had fallen and broken.

4. DAMAGES—BACK INJURY—REMITTITUR—PROXIMATE CAUSE.
    Verdict of $12,000 upon which judgment was entered is ordered
    set aside as excessive unless plaintiff remits all in excess of
    $5,000, where she sustained injuries to her back which have
    completely healed, but continues to suffer from causes not
    attributable to the accident and incurred monetary loss of
    $301.50.

5. COSTS—REMITTITUR—NEITHER SIDE PREVAILING IN FULL.
    No costs are allowed on appeal, where plaintiff is required to
    file a remittitur of excess over $5,000 or have her $12,000
    judgment set aside, since neither side has prevailed in full.

REFERENCES FOR POINTS IN HEADNOTES
[1–3] 38 Am Jur, Negligence § 131 *et seq.*
[1–3] Duty and liability respecting condition of store or shop.
    33 ALR 181; 43 ALR 866; 46 ALR 1111; 58 ALR 136; 100 ALR
    710; 162 ALR 949.

Appeal from Delta; Jackson (Glenn W.), J. Submitted April 18, 1952. (Docket No. 71, Calendar No. 45,444.) Decided June 2, 1952. Rehearing denied September 3, 1952.

Case by Annie T. Kelly against Red Owl Stores, Inc., for injuries sustained when she slipped and fell to the floor while in defendant's store. Verdict and judgment for plaintiff. Reversed and new trial granted unless remittitur is filed.

*McGinn & Fitzharris,* for plaintiff.

*Harlan J. Yelland* (*Ward & Plunkett,* of counsel), for defendant.

REID, J. Plaintiff brought this action to recover damages for personal injuries received by her by reason of slipping on a damp spot on the floor of defendant's store, and falling, so that her back was injured. A verdict for $12,000 was rendered for plaintiff by a jury. From judgment had thereon, defendant appeals.

Defendant operates a serve-self grocery, vegetable and meat store in Escanaba, Michigan. On Thursday, August 25, 1949, a 3-ounce glass jar of olives fell or was knocked off a shelf in defendant's store onto the floor of an aisle leading from the front entrance of the store back to the meat counter. The glass jar broke and the contents, half olives and half juice, spilled onto the floor at a place about 20 to 25 feet from the front entrance. The floor was a mottled dark green asphalt tile. Ronald Moras, a 22-year-old employee of defendant, went immediately to the scene and swept the olives and broken glass into a cardboard box, took the debris to a back room and immediately returned with a mop and mopped up the rest of the fluid, leaving a damp spot about 3 or 4 feet in area. There were no pools of

water or fluid and the damp spot was visible. Moras then went again to the back room, picked up a dry mop and "went right back" to dry up the damp spot. The plaintiff testified that as she walked from the front of the store, the aisle was clear and she saw nothing in the aisle and there were no people in the aisle. Witness Moras testified that in general his instructions were to put up a barricade or box to warn people, *i.e.,* of a dangerous condition of the floor.

Mr. John Ryan, the manager of the defendant's store, was within 30 or 40 feet of the place of the accident, heard the crash of the jar of olives when it struck the floor, walked over there, saw the damage that was done, watched Moras clean up the olives, glass, et cetera, and took the label that was on the broken jar of olives. The store is 100 feet long and 70 feet wide; the mops are located in the north part of the store, north 50 feet and east 25 or 30 feet from the place of the accident. Mr. Ryan stayed at the spot in question while Moras cleaned up the glass and after removing the label from the broken glass, went about his business.

Before Moras returned with the dry mop, plaintiff came to the damp spot, slipped, both her feet went out from under her, and she fell on her back.

Ryan testified that he examined the spot after plaintiff had left the spot. The spot was damp, not slippery.

There is no showing that plaintiff was guilty of contributory negligence.

Defendant argues with considerable force that the defendant moved with fair and reasonable diligence to remedy the condition caused by the fall and breaking of the glass jar of olives. Defendant is not shown to have been at fault as to the breaking of the glass container and is not an insurer of the safe-

ty of patrons. It would take an ordinarily prudent and careful person some little time to remedy the condition.

Defendant's employee, Moras, testified, "I knew it was slippery," referring to the spot in question and referring apparently to the time when he first returned after carrying out the olives. Negligence of defendant could only be found on the proposition that Moras, who was left by the manager Ryan in charge of the cleanup operations, knew that the spot had not been sufficiently cleaned up when he left to get the second mop, but left the spot unguarded either by a person in charge, or by barricade, while he went after the second mop. The round trip for the second mop required Moras to travel 75 feet each way, a total of 150 feet. Plaintiff was not in sight when Moras left to obtain the second mop; she had fallen before he returned. There was some foundation for the jury's verdict that defendant was guilty of negligence, even though it is easier to come to that conclusion after the accident occurred, than it would have been before plaintiff fell, viewing the situation as things would occur to the mind of an ordinarily prudent person. The jury could well have found that even with the damp spot remaining after the first mopping, the aisle was reasonably safe for the public to use.

Plaintiff testified that when she fell she did not try to arise, that a store clerk came to assist her; that someone brought a box on which she sat 5 or 7 minutes; that Mr. Ryan came and said he would get a doctor and wanted her to go to a hospital, but she refused and said she wanted to go home first; that several men assisted her to an automobile, which took her to her home at the residence of Father Thompson where she was staying permanently as assisting housekeeper; after her arrival at Father

Thompson's residence, Mrs. Clara Potvin, the house-keeper, tried to get plaintiff to lie on a couch, but she couldn't lie down; an overstuffed chair was brought; Mr. Rodman brought boards and took the mattress from the bed and put the boards on the springs and plaintiff tried to lie like that, but couldn't lie on a soft bed.   Two days later, and on Saturday, August 27th, she went to a hospital and there Dr. LeMire attended her.   Plaintiff remained in the hospital a week and had to sit in a chair all the time.   Plaintiff testified that her meals had to be brought to her in her bedroom all winter and that she suffered pain all the time, and especially when she moved; she got up 3 or 4 times during the night and Mrs. Potvin assisted her; that she wears a corset and never leaves it off, because she feels the corset helps her.   Mrs. Potvin testified that the mattress was put back on her bed in March.   Plaintiff says she sleeps on the boards yet.

Dr. William A. LeMire, plaintiff's attending physician, sworn as a witness for plaintiff, testified that he examined plaintiff August 27, 1949, 2 days after the accident, and that there was a muscular spasm in the lumbar group of muscles, and tenderness along the spine and lower back region.   He further testified:

"I had her confined to St. Francis hospital in Escanaba on September 2, 1949.   X-rays were taken at that time.   The X-rays showed a compressed fracture of the first lumbar vertebra with fracture of the anterior lip which more than likely is a fracture through an arthritic spur, increase in the intervertebral space between the first and twelfth lumbar vertebrae; there is shortening in the length of the anterior body of the first lumbar, shortening in the twelfth lumbar showing slight compression of the thoracic vertebrae and compressed fracture of the first lumbar vertebra.   A compressed fracture is when

part of the vertabra is crushed down, due to pressure. The X-rays taken from the anterior-posterior view, show a compression in the first lumbar vertebra and twelfth thoracic vertebra. Exhibit 5 is an anterior-posterior view showing a compression in the first lumbar and twelfth thoracic vertebrae. On December 7th, the X-rays again showed our depressed or compressed fracture of the first lumbar vertebra. The twelfth shows healing; the first lumbar shows healing; but we still have our shortening in the distance between the anterior body of the first lumbar as compared with the second lumbar and the eleventh thoracic. The shortening here. This body here is compressed as compared with this one. And the distance. The compression is permanent.

"There is decrease in the calcification of the whole spine. It means that the nutrition of the spine has been decreased; a decrease in the circulation with resultant loss of mineral substance in the bone due to nonuse. It makes the bone weaker; more brittle. * * * There is a little angulation of the spine at the site of the fracture; a tilting of the spine."

The doctor further testified that he continued to care for plaintiff until X-rays were taken on August 31st and that she continued to complain of pain and soreness in the back, and that she was instructed not to bend or do any heavy lifting; that she stayed pretty much on her back; that she was given heat and massage and physiotherapy; that he continued to care for her up until the trial. He further testified plaintiff weighed 169 pounds when he first examined her and that in the week before the trial she weighed 172 pounds. He further testified,

"The prognosis would be pretty good providing she does not get another fall or gets pushed forward to jack-knife the spine."

Dr. John J. Walch, defendant's witness, testified that he examined plaintiff at a hospital in Escanaba on or about October 21, 1950, that she was in a room with Dr. Harold Groos when he arrived; that she moved about the examining room by herself without any aid; and that X-ray plates were taken of the dorsal and lumbar spine, anterior, posterior and lateral; and that he took her history. Dr. Walch further testified:

"*Q.* Now upon your examination, doctor, what would you say in your opinion in regard to her recovery?

"*A.* She still has some pain, I think, on movement, as anyone else would have with arthritis, and this lumbar vertebra seems to be well healed. These lumbar vertebrae. Pretty well healed. And I don't say she could do heavy work. She has to be careful.

"*Q.* In what relation is her age to this condition? As to the arthritis?

"*A.* That is usually caused by age and the colds and the different things we have during life. That causes the arthritis.

"*Q.* And do you think that under the conditions she will make a complete recovery?

"*A.* No, she never will, on account of that arthritis she has. That is going to keep her down.

"*Q.* I mean as far as the injury; the fracture; will that heal over completely?

"*A.* Our X-ray reports state it is completely healed."

Dr. Harold Q. Groos, defendant's witness, testified that with Dr. Walch, he made an examination of plaintiff, October 18, 1950; that she was walking at that time; that she gave a personal history. Dr. Groos testified among other things as follows:

"*Q.* Now can you point out to the jury on that [X-ray] plate where there is any positive fracture or was not positive fracture.

"*A.* This is the first lumbar vertebra. At the superior upper border there is—here—with a projection of an eighth of an inch on its upper anterior surface, indicative of an old injury at this point. The height of the body of the vertebra is somewhat slightly diminished in respect to the bodies of the corresponding vertebrae. There is cupping of several of the vertebrae along the entire spine. The first lumbar apparently is healed and a solid union has taken place at the site of a previous possible fracture. There is also arthritic spurring and projections along the course of several of the other vertebral bodies."

Dr. Groos further testified that the X-ray plate shows that the upper part of the body of the first lumbar has been slightly compressed and evidently the anterior part of the bone has been pushed out a trifle, but it had completely healed at the time the picture was taken, and that there was evidence of a definite osteo-arthritis present in practically all of the vertebrae; that there was evidence of a fracture at the anterior upper border of the first lumbar. Dr. Groos further testified:

"*Q.* From your examination of this patient and from your examination of the plates as have been exhibited here what is your opinion as to the proper or satisfactory progress of this condition?

"*A.* Well, the progress of the case has been quite satisfactory. Without the application of any amount of treatment she has made as good a recovery as I believe she is able to make under the conditions."

Dr. Groos also testified that he and Dr. Walch signed a report, October 18, 1950, in which it was stated, "It is hard for her even to walk."

Plaintiff's total doctor's bill is $200 and her hospital bill, $101.50. No charge was made by Mrs. Potvin for caring for plaintiff at Father Thompson's residence. Before the accident, plaintiff had been post-mistress at Franklin Mine for 10 years, had voluntarily retired, and was receiving a pension at first of $27 a month and 6 months later it was raised to $34.74 per month. The testimony does not warrant any conclusion that plaintiff suffered any monetary loss greater than $301.50 as a result of the accident. The balance of the verdict of $12,000 must have been for pain and suffering. No ground is shown for allowing plaintiff damages for loss of future earnings.

Defendant claims the verdict is excessive. The doctors sworn as witnesses agree on the fact that plaintiff has well recovered from her injury. It is clear that the vertebrae involved in the injury are well healed. The painful effects of the compression of the vertebrae have evidently faded out with the complete healing of the vertebrae. No doctor testified that decalcification of the vertebrae was caused by the injury. Plaintiff's attending physician and witness, Dr. LeMire, testified that he would not undertake to say that trauma will cause more arthritis. Plaintiff's high blood pressure was not caused by her injury. Plaintiff's present pain is evidently caused by arthritis and high blood pressure not attributable to the accident, but which the jury very evidently must have attributed to the accident, for otherwise they would not have made the high award which they rendered.

Plaintiff went into details as to her suffering and consequent helplessness even after the vertebrae had healed and also as to present and future helplessness and consequent need of assistance, none of which is attributable to the injury.

For some cases in which we have required a remittitur of part of an excessive award, see: *McLean* v. *American Railway Express Co.*, 243 Mich 113; *Leary* v. *Fisher*, 248 Mich 574; *Pembor* v. *Marcus*, 307 Mich 279.

The verdict is excessive.. The judgment appealed from will be set aside unless the plaintiff shall remit all of the verdict in excess of $5,000. No costs, neither side having prevailed in full.

NORTH, C. J., and DETHMERS, BUTZEL, CARR, BUSHNELL, SHARPE, and BOYLES, JJ., concurred.